Statement of the Case.
MONROE, C. J.
This is an action under the “Employers’ Liability Act” (No. 20 of 1914), in which plaintiffs, as surviving parents, claim compensation for the loss of their son, Mason Farris, a minor under 18 years of .age, who was killed by accident while in defendant’s employ, and, as plaintiffs allege (that allegation presenting the main issue in the case), whilst “performing .services arising out of and incidental to his employment in the course of his employer’s business.” Plaintiffs claim $2,700 as 50 percent. of decedent’s wages during a period of 300 weeks; and the trial court gave judgment in their favor against the two defendants, in solido, for $1,500. They and the Lumber Co. have appealed: the failure of the other defendant, Victoria, Fisher & Western Railway Company, to do likewise being explained by the fact that it was admitted on the trial that the lumber company owns the “holdings” of the railway company, the one company being therefore merely a subsidiary, or agent, of the other, and plaintiffs being apparently satisfied with the responsibility of the Lumber Co.
It appears from the evidence that in 1918 defendant was operating a sawmill at Victoria, in the parish of Sabine, and owned and operated (through the railway company) a railroad, connecting that town with “Fisher,” about 24 miles distant, in the same parish; that the decedent, Mason Farris, was employed by it as a member of its “steel gang,” consisting of 25 or 30 men (under a foreman, named Teasley) which gang had certain functions to discharge in the matter of the maintenance of the road; that for the discharge of those functions they were carried out from Fisher every morning, on a work train, consisting of a locomotive and caboose, which left Fisher at 7 o’clock and ran to the mill, at Victoria, whence its departure in the evenings was timed so as to enable the men to get back to Fisher (or “home,” as that place was called) by 6 o’clock in the evenings; that on the afternoon of May 15, 1918, they left Victoria, and at about 20 minutes before 5 o’clock, had reached a point where they stopped to pick up tools which had been left on the side of the road, and then discovered that there was a train on the track, about 100 yards ahead of them, which the witnesses refer to as a wrecked train-, and one of the cars of which was derailed; and that the accident here in question happened just after the tools had been taken aboard and the work train had started, and was moving slowly in the direction of the wreck. No witnesses were called to testify as to the immediate circumstances of the accident (probably because no one else was acquainted with them) except Ed Teasley, foreman of *109 the steel gang, C. E. Bradshaw, conductor of the work train, and Ben Williams, engineer in charge of the locomotive by which the killing was done; and the following synopsis from! their testimony contains the substance of everything said by them which seems of importance to the questions to be decided, to wit: Ed Teasley, foreman, called by defendant, testifies as follows:
“Q. Just tell what you know of the facts in connection with his (Farris’) death. A. I don’t know, anything more than before the accident happened. I was standing by the caboose door. The boy was standing by my side, and the gang was loading the tools on. He was helping load them. The last account I had of him, he was putting on the last tools. I made the remark, ‘All right; we’re through; let’s go ahead and see what is ahead.’ Time was up to go home. I never seen the boy any more. I walked the distance of 30 feet or more, and gave the signal to the conductor, and said ‘All right; let’s go;’ and the next moment the signal was given, the boy was killed. Q. Did you see him when he went in front of the engine? A. No, sir; I didn’t see him. The last account I had of him, he was loading the tools. * * * I saw the last tool put in the caboose, and I turned and hollered, ‘All right; let’s go.’ I walked to the engine before I said, ‘Let’s go,’ and reached up to get on the engine, and said ‘Let’s go.’ I don’t know where the boy went from the place where we were loading, till he was killed. I told them to load on. Q. What did you mean by ‘load on’? A. I meant for the boys to get on the car. You see*my crew was supposed to stay on the car until I ordered them out, and when I got through with them, loading the tools on the outside, I told them to load on — meaning for them to get back on the car. This-boy was in the caboose, and when I ordered the tools loaded on he came out with the rest and helped load the tools. Where he went after that, I couldn’t say.
* * * Q. Did they [the steel gang] have any instructions not to ride it [the engine]? A. Yes, sir; I told them, the'whole crew, not to ride the train any more than the caboose. That was before the boy begun to ride. * * * Q. Ask you whether or not there was sufficient room, or accommodation, in this caboose, for all your men? A. Yes, sir; plenty of room, comfortably. * * * Q. Could he have heard you say ‘All right; we’ll move on down and see what the trouble is?’ A. Yes, sir; he could have put his hand on me. Q. Then you know he could have known there was trouble ahead, with the other train? A. Yes, sir; when there was a train ahead and I got news there was a log car off. Q. Didn’t you, at that time — the time you made the statement, ‘We’ll move on down and see what’s the trouble ahead,’ — believe that you would have business for those boys to do? A. I don’t know about that; I told the boys to ‘load on, and let’s go and see what is ahead.’ This is my business. If I need the boys, afterwards, if I get any work. I go back and call for such men and tools as I need to do it. I go ahead and see, and come back myself, and call for such tools as I need. Q. Then the boys were still under your direction? A. Yes, sir; until they got to town * * * Q. When does the men’s time start? A. Seven o’clock in the morning. Q. Is that when 'ho starts from the mill, on the train? A. Yes, sir. Q, And it stops when he leaves? A. Yes, sir. Q. And it stops when he reaches town, at night? A. Yes, sir.”
C. E. Bradshaw, the conductor of the train, testifies that, just before it started from the place where the tools were picked up, he got on the front of the engine, and was seated on the crossbar, on the fireman’s side, and that a negro was seated on the bar on the engineer’s side; that he was looking back, waiting for a signal from the foreman of the loading gang, and when he received it he passed it on to the fire'man; that the engine was started -and was moving very slowly when the boy made his appearance, .near the front; that witness thought he was going to try to get on, upon the side, where he was sitting, and that he turned around to take Ms feet off so that the boy could get on, but that he failed to get on, on that side, and ran across the track, in front of the moving engine, and Ms foot seemed to slip, “and he failed to get it”; that witness saw him drop, and grabbed him with his right hand; held him until he saw that he could not get him when he turned him loose, and signaled for them to stop the train, which they did as quickly as they could; it was the duty of the work train to carry the men in, in the evenings; the boy was endeavoring to get on *111 the engine when he was killed; the cabo'ose was set aside for the carrying of passengers; it had side doors with steps up to them; doesn’t know about Earris having had any-warning about riding on the front end of the train; all he knows is that about two weeks before the engineer told witness to tell some negroes, on the front end of the engine, to get off, and that nobody was allowed to ride on there, and this white -boy was on there, and when witness told the negroes what the engineer had said, witness saw him step aside; the engineer could only have seen the negroes; witness had taken his position before the train started; doesn’t know when the negro got on; the train carried 25 or 30 workmen; doesn’t know the size of the caboose; it was the duty of the train to carry the workmen out in the morning and home at night; the distance from Victoria to Fisher is about 24 miles. We, now quote the witness, literally, as follows:
“When I first saw the boy, he was coming around to where I was sitting on the train. He passed me, turning to catch on. I gave — I moved my feet so that he could get on, as I thought he was going to try to get on, where I_was, and, instead of catching on on that side, he ran across, in front of the engine, and turned out, on the outside of the rail, before he turned to eateh. The engine was running' very slowly.” Redirect: “Q. Did you hear anybody holler, ‘All aboard’? A. No, sir; the steel gang foreman gave me the signal, ‘All right.’ Q. That was all was said? A. When he got ready, he gave me the signal.”
The quotation contains the last statement made by the witness.
Ben Williams, the engineer of the train testifies as follows: He saw no part of the accident; it is against his rule and the rule of the company for any one other than train employees to ride on the front end of the engine; has endeavored to enforce the rule by having the conductor and.fireman put such others qff; the steel gang were not permitted to ride on the engine; can’t remember to haye told Farris, individually, to get off the engine, but has told the whole crew, all of them, together; it has not been customary, since he has been there, for laborers to ride on the steps, or just anywhere they could get on, where the train was to move but a short distance; he never let any workmen ride on the engine at all; and that evening they were ready to go home; “yes,” there was a wreck in front of them, but they were on their way home; “yes,” he knew that they would have to stop at the wreck; “no,”, could not see the wreck, plainly; saw the train down there, and som'e one told them the cars were wrecked; “we had to assist in getting them on, and clearing the track.”
It further appears that plaintiffs have nine surviving children, of whom five are living with them; three of the five (including two girls) being minors, the fourth a grown daughter, and the fifth, a son about 27 years of age; and all of whom, as we read the testimony (save, possibly, the last mentioned), derive their maintenance from the cultivation of 25, out of 80, acres of “poor, sandy, land,” constituting the family homestead; some slight pecuniary assistance being contributed by a married son. During the year 1918 (immediately preceding that of the trial in the district court, the “farm,” if it can be so called, is said to have yielded 2y2 bales of cotton, 50 bushels of corn, a few potatoes, and some cane. The family own a cow and a calf, a pony and a horse. Prior to December 9, 1917, Mr. Farris had a store, with a stock of merchandise valued at $3,000 or $4,000, but it burned on that day and was wholly uninsured, and thereupon the boy, Mason, left home and went to work at such wages as he could get, “to help, support the family.” We are Satisfied that he contributed to that object all that he earned, beyond that absolutely required for his expenses, which were very limited. A statement prepared by defendant shows that, up to the time of the *113 accident, lie had worked for it 17% days in April, and 13 days in May at first at $2.20 a day, then at $2.75, and, when killed, at $3 or $18 a week.
Opinion.
Section 1 of Act 20 of 1914 begins by declaring that “this act shall apply only to the following.” Then comes paragraph 1, which is inapplicable here, after which, this:
“2. Every person performing services arising out of and incidental to his employment in the course of his employer’s trade, business or occupation, in the following trades, businesses and occupations.”
And then follows an enumeration of hazardous businesses, including “sawmills, and the maintenance and demolition of railways and railroads;” and other provisions from which it results that, the act being accepted, by both plaintiff and defendant, as the law of their case, neither the defense of assumption of risk, negligence of a fellow servant, nor negligence of the injured employee himself can be entertained. On the other hand, section 28 of the act reads:
“That no compensation shall be allowed for an injury caused (1) by the injured employee’s willful intention to injure himself or to injure another, or (2) by the injured employee’s intoxication at the time of the injury, or (3) by the injured employee’s deliberate failure to use an adequate guard or protection against accident provided for him, or (4) by the employee’s deliberate breach of statutory regulations affecting safety of life or limb.”
[1] The-evidence adduced furnishes no answer to plaintiff’s allegation that their son was killed while in the discharge of his duties as an employee of the defendant. It was his duty to get on and off the work train, furnished by defendant for his transportation, when ordered by the foreman of his gang; and as, by order of the foreman, he got off the train and helped put the tools into the caboose, so by order of the foreman he was attempting to get on the train, when he was killed. It is no answer to plaintiff’s claim for compensation, under the quoted statute, to Say that decedent brought about his own death, by negligently attempting to board the train while in motion and to get on the front of the engine, which was dangerous, when he might have boarded the caboose, in safety, while the train was standing still, since his negligence is not an element in the case, unless made so by section 28 of the act, to which we shall again refer. According to our understanding of the testimony, decedent’s imprudence or negligence should be attributed to defendant’s agents, and not to him. He entered defendant’s employ young and wholly inexperienced, and, so far as the record shows, during the 30% days that he rendered service in that employ he received no warning -whatever of the great danger of attempting to board, while in motion, the train upon which he was carried to his work, and back; nor, so far as the record shows, was he ever informed that it was against any rule for other employees than the train crew to ride elsewhere than in the caboose. The danger in question is one which, it may safely be said, no boy' fully appreciates, and which a boy in daily association with railroad men who constantly take the risk is likely to regard as altogether negligible. As to the alleged rule of the defendant company, not only does defendant fail to show that the boy was informed of it, but it appears that he had the evidence, furnished by his eyes, that no such rule was enforced, for the moment before he made his deplorable attempt he must have seen the foreman of the steel gang, who was not a member of the. train crew, get on the engine, and, as we infer, into the cab, with the engineer; and perhaps the last things seen by him were the conductor of the train moving his feet in order to make room for him, on the front • of the engine, and the negro, seated without objection from any quarter, on the other end *115 of the “crossbeam,” on engineer’s side of the engine and in plain view of the engineer. If is true that the conductor and the engineer testify that the steel .gang had been notified not to ride elsewhere than in the caboose, but the conductor says that his notice was given before the boy was employed, and the engineer fails to say that he gave any such notice to the boy, or to the steel gang within the 30 days after the boy had become a member of it. It is true also that the conductor testifies that the engineer on one occasion told him to tell some negroes who were on the front end of the engine to get off, that nobody was allowed to ride on there; that when he had delivered that order to the negroes, who were on the engineer’s side and could be seen by him, he walked around to the other side, and found young Parris getting off from there; but he does not say that Parris was there when he spoke to the negroes, or that he heard the order given to them, or that he (the witness) knew that Parris applied the order to himself; or that the negroes had any connection with defendant’s business; he merely and impliedly suggests the inference that the order was so heard and applied by Parris. On the other hand, the conductor himself testifies that on the day and at the very moment of the accident a negro was sittirig upon the one end of the crossbar, on the engineer’s side, the other end of which he (the conductor) was occupying, .and we find no suggestion anywhere that it occurred to either the conductor or the engineer to order that negro to get off. Moreover, the foreman, after testifying that he had instructed the .steel gang, not to ride on the train, elsewhere than in the caboose, admitted, a moment later on cross-examination, that, “Sometimes the boys would sit on the hind end of the tank,” to which apparently he made no objection.
The testimony of the foreman discloses rather a peculiar experience, and, taken in | connection with that of the conductor, leaves the impression that the whole story of the tragedy has not been told by the witnesses. He says that he stood by the boy, at the door of the caboose, and saw him put in the last tool; and he then walked, say, 30 feet, and got on the locomotive, after calling and giving the signal to start, but that he did not again see the boy, and that he was killed immediately after the signal was given. If, however, the start was made as quickly as that, the boy must have passed over the 30 feet between the door of the caboose and the cab of the engine about the same time as the foreman, and it would seem remarkable that the foreman should not have seen him.
The conductor, up to the time that he received the signal to start, was seated on the crossbar, or beam', on the front of the engine, fireman’s (or left) side, “looking back.” He received the signal from the foreman, and must therefore have seen him; but, though the boy must have been in the line of his vision, he does not speak of seeing him until he was “coming around in front,” etc. He makes two statements as to what then occurred — the one, in the beginning, and the other near the close of his testimony, to wit:
“I signaled the fireman to go ahead, and I didn’t look back any more until I saw the boy coming around in front of me, and the engine was starting off very slowly, and, when 1 saw him I thought he was going to try to get on where I was, and I moved my feet to let him on, but he started to go across the track, I guess to get on the other side. I turned around to take my feet off, so that he could get on, and he failed to get on my side, but ran across the track, in front of the moving engine, and his foot seemed to slip, and he failed to get it. I saw him drop, and I grabbed him. I got the boy with my right hand, and I held him until I saw I couldn’t get him out, when I turned him loose and signaled them to stop,” etc.
The last statement that he makes- reads:
“When I first saw the boy, he was coming, turning around to where I was sitting on the *117 train. He passed me, turning to catch on. I •gave — I moved my feet so that he could get on, ■as I thought he was going to try to get on where I was, and, instead of catching on on that side, he ran across, in front of the engine, ■and turned out on the outside of the rail, before he turned to catch. The engine was running very slowly.”
According to the last statement, then, the boy had crossed the track from the left (or fireman’s) side, as the locomotive was headed, had reached the right (or engineer’s) •side, outside of the rail, and was there attempting to catch on, when his foot slipped, and the witness, seated on the left side, grabbed him. The engineer did not see him at all, and did not know that anything had occurred until he was signaled by a negro in a wagon. We fail to understand the situation, as described by the witnesses, but are of opinion that it, at least, serves to show that the boy lost his life in a very earnest effort, however imprudent, to perform his ■duty to his employer, by getting on the train, in order that he might be carried to the place, in plain sight, where it seemed that he would be called on to render further service arising out of his employment.
[2] Defendant’s learned counsel argue that the case should be governed by the provision of section 28 of the statute, to the effect:
“That no compensation, shall bo allowed for an injury caused * * * (3) by the injured ■employee’s deliberate failure to use an adequate guard or protection, against' accident, provided for him.”
Our answer to the argument is that the provision invoked presupposes a specific danger, with an appropriate and adequate guard and protection against it; knowledge of both danger and guard, brought home to the employee; and a “deliberate” failure on his part to make use thereof; and that it has no application to a case where no guard or protection has been provided against the danger the assumption of the risk of which has caused the accident, and where such risk has been assumed, not deliberately, but, under conditions which rendered it necessary for the employee to decide, instanter, as between two courses, either of which, so far as he was informed he was free to choose, the more efficiently, as he conceived, to perform his duty to his employer. The accident out of which this suit has arisen resulted from the attempt of the decedent to board the train while it was in motion, and, for aught that appears, it may have been as dangerous for him to have made that attempt by way of the caboose, under the then existing circumstances, as by way of the locomotive; for, if the foreman is to be believed, there were 30 men at the side door of the caboose awaiting his order to “load on,” coincidently with which he signaled the train to move on; and it appears to us equally certain that the 30 could not all have got into the door at the same time, and that the train started as soon as the conductor received the signal.
The boy, therefore, being probably the youngest of the 30, may have found his prospect of getting into the caboose rapidly receding; and, not deliberately, but on the spur of the moment, and impressed with the feeling that he must be on hand, with others, for the work of clearing the track of the wrecked train ahead of them, decided to get on the engine, once aboard of which, so far as we are informed, he would have been as safe, for a slow ride of 100 yards, on a straight track, as in the caboose. It is true that getting on the pilot of a moving locomotive appears to us to be highly dangerous, but the decedent was a raw country boy, who had been in defendant’s employ only 30% days, and no one had ever told him how very dangerous it is; and no one who.has spoken into this record tells us how dangerous, or how entirely impossible, it may have been for him at that time to have climbed into the door of the caboose. There could be no better evidence that, in choosing his *119 course, under the circumstances, he was unconscious of violating any rule established by his employer than is to be found in the fact that what he did was done openly and under conditions which would seem to have made it impossible that he should not have been seen by every representative of the defendant who had anything to do with the enforcement of its rules. It was not the fault of the boy that the foreman did not see him, since he must have passed the foreman on the way to the front of the locomotive; the conductor did see him, and moved aside in order to make room for him on the front of the locomotive, and his final attempt to get on was made on the engineer’s side of the locomotive, in plain view of, and but a few feet distant from, the engineer; and we find nothing in the testimony to suggest the idea that he was the kind of a boy who would deliberately, without provocation or reason, and, it may be said contemptuously, defy the authorities under whom he was working. Under paragraph (7) of section 8 of the act of 1914, as amended and re-enacted by Act 243 of 1916, p. 515, plaintiffs, as surviving parents of decedent, are entitled, in default of a widow or child, to recover 50 per cent., during 300 weeks, of the wages that the boy was earning at the time of his death, amounting to $2,700, instead of $1,500, as awarded by the trial court.
It is therefore ordered that the judgment appealed from be amended by increasing the amount' of the award in favor of plaintiffs, as therein made, from $1,500 to $2,700, the same to be paid as follows: The aggregate amount, at the rate of $9 per week from May 15, 1918, until the day upon which this judgment becomes executory, to be paid without further delay, and the balance to be paid weekly at the same rate until the expiration of a period of 300 weeks from said. May 15, 1918, until final payment. It is further ordered that as thus amended said judgment be affirmed at the cost of defendant.