## Bingham's Administrator, et al. v. Commonwealth.

## Commonwealth v. Bingham's Administrator, et al.

(Decided November 3, 1922.)

### Appeals from Jefferson Circuit Court (Common Pleas, Third Division).

1. Taxation—Inheritance Taxes.—The Kentucky inheritance tax law, section 4281a, Kentucky Statutes, imposes a tax upon the transfer to heirs, devisees, etc., of all property of which a resident decedent died "seized or possessed," and it is held that Mrs. Bingham who died a resident of this state was at the time "pos-sessed" of property which had been devised to others in trust for her sole use and benefit for a limited period of time and to her absolutely thereafter, although she died before the expiration of the trust period; and that therefore her devisees, unless exempt under the law, must pay an inheritance tax on their respective interests in such property.

2. Taxation—Inheritance Tax.—The amount of the tax paid by her personal representative to the Federal government, pursuant to act of Congress approved September 8, 1916, is to be deducted from the total value of her estate to ascertain the amount upon which the state inheritance tax is to be computed.

3. Taxation — Inheritance Tax — How Determined. — Inheritance Taxes imposed by other states in which property is located are to be deducted from the value of such property to ascertain the amount upon which the Kentucky tax is to be computed.

4. Taxation—Legacies—Exemptions.—Legacies to educational and religious organizations not operated for gain but as purely public charities, both in and out of the state, are exempted from the tax by subsection 4 of the act, being section 4281a-4, Kentucky Statutes.

5. Taxation—Appraisement of Stocks and Bonds.—Large blocks of stocks, bonds and securities customarily traded in upon the open market in New York city and elsewhere, are to be appraised by the same method as are small blocks thereof; and, it being conceded that blocks of from ten to one hundred shares are the units in which such stocks are customarily traded in and that the fair cash value of such units on the taxing date is proven by the established market price of that date, it follows that all of such securities as were owned on that date, regardless of the number or total value thereof, were properly appraised at such market price, since articles of property must be appraised in such units as ordinarily traded in and not in the blocks or masses in which they happen to be owned.

6. Taxation—Inheritance Tax—Interest.—Interest runs at six per centum per annum from eighteen months after the death of the decedent, upon the amount of the inheritance tax ultimately found to be due, whatever the cause of the delay beyond that time in paying same.

7. Taxation—Appraisement of Railroad Stock.—Where all of the stock in a railroad company of the par value of $12,500,000.00 was owned by one person and same had never been offered for sale or paid a dividend, the court did not err in fixing its value at 25 cents on the dollar under the evidence introduced as to its value.

HELM BRUCE and BRUCE & BULLITT for the administrator, &c.

CHAS. I. DAWSON, Attorney General, for the Commonwealth.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming upon the appeal by the administrator and affirming in part and reversing in part on the appeal by the Commonwealth.

These two independent appeals from the same judgment, one by the plaintiff and the other by the defend-

ants, present many questions of law and fact with reference to the inheritance taxes due the Commonwealth of Kentucky by the various beneficiaries under the will of Mrs. Mary Lily Bingham, who died a resident of Jefferson county, Kentucky, July 27, 1917.

At the time of her death Mrs. Bingham had the absolute title to and actual possession of a very large estate, and this portion of her estate is known in the record and will be referred to as the "Bingham estate." In addition, she had the entire beneficial interest under the will of her first husband, Henry M. Flagler, in certain properties of large value, nearly all of which is personalty, being administered by trustees in accordance with the Flagler will, and this property is known in the record and will be referred to as the "Flagler trust."

The questions of law presented for decision will be considered first, and in the following order without reference to whether they were raised by the plaintiff, the Commonwealth of Kentucky, or the defendants, who are the administrator with the will annexed of Mrs. Bingham, and her devisees:

1. Is Mrs. Bingham's interest in the Flagler trust which passed under her will subject to an inheritance tax in this state?

2. Is the amount paid by her administrator to the Federal government as an "estate tax" to be deducted from the value of the estate in fixing the net amount subject to the Kentucky inheritance tax?

3. Are the amounts paid by the administrator to states other than Kentucky as inheritance taxes to be deducted in determining the amount upon which the Kentucky tax is to be computed?

4. Are legacies to the University of North Carolina and hospitals and churches located in Florida subject to inheritance taxes in this state?

5. Are large blocks of stocks and securities, customarily traded in and quoted daily upon the open markets in New York city and elsewhere to be appraised by the same rules as small blocks of such stocks?

6. From what date is interest to be computed upon the inheritance tax ascertained to be due?

1. The applicable portion of our inheritance law with reference to whether the so-called "Flagler trust" property is liable to the tax, is that part of subsection 1 of section 4281a, Kentucky Statutes, which reads:

"All property which shall pass, by will or by intestate laws of this state, from any person who may die seized or possessed of the same while a resident of this state, or if such decedent was not a resident of this state, at the time of death, which property, or any part thereof, shall be within this state, or any interest therein, or income therefrom, which shall be transferred by deed, grant, sale or gift, made in contemplation of the death of the grantor or bargainor, or intended to take effect in possession or enjoyment after such death, to any person or persons or to any body politic or corporate, in trust or otherwise, or by reason whereof any person or body politic or corporate shall become beneficially entitled in possession or expectancy, to any property, or to the income thereof, shall be and is subject to a tax for the general use of the Commonwealth, upon the fair cash value of such property in excess of the exemptions hereinafter granted and at the rates hereinafter prescribed."

It is the claim of the defendants that Mrs. Bingham at her death, was not "seized or possessed," in contemplation of the above provision, of the so-called Flagler trust property, and that the same, although it passed to them under her will, is not subject to the inheritance tax.

Section 460 of the Kentucky Statutes provides in substance that in construing a statute common words must be given their common meaning, and technical words their technical meaning. Counsel agree that the word "seized" is a technical word, and given its technical meaning Mrs. Bingham did not die "seized" of the Flagler trust property. They also agree that "possessed" is not a technical word, but counsel for defendants earnestly contend that she was not "possessed" of any of this property as the word is ordinarily employed and understood, while counsel for the plaintiff insist that at her death she was so "possessed" of this property.

We are furnished by counsel with cases from this and other courts determining the meaning of the word "possessed" under varying circumstances, but in the light of the requirements of section 460 of our statutes quoted above, requiring that an ordinary word such as "possessed" shall be given its common and ordinary meaning, we think that we should look to the standard dictionaries to ascertain the meaning that should be ascribed to it here, rather than to the opinions of courts under dif-

ferent circumstances and when not so bound. Webster's New International Dictionary gives several definitions of the verb "possess," the first of which is marked "obsolete," and the next is: "To have and to hold property; to have a just right to; to be master of; to own, as to possess land, money, a horse, a watch." Other less common meanings, more or less derivative or secondary, are stated, and then the following words are given as synonyms: "Hold, occupy, control, own." It is therefore clear, we think, that this eminent authority fully recognizes, and it is in truth matter of common knowledge, that the verb "possess" is commonly employed to indicate ownership of any kind of property.

Illustrative at least of this "common and approved usage" of the word "possessed" is the fact that Mrs. Bingham in her will employs the same word in connection with "seized" to describe the property, including the Flagler trust, she devised to the defendants; and they are therefore in the peculiar position of claiming that for their benefit it is to be construed as synonymous with "own" in the will, but not so in the statute.

It is only in its technical or strictly legal sense that "possessed of" can be limited to mean only actual physical possession, or the right of immediate actual possession, as counsel for defendants insist, and there is no basis whatever, in our judgment, for assuming as they do that the legislature intended that the word "seized" should apply to real estate, as technically it does, and that the words "possessed of" should apply in the same strict and limited way to personalty.

Mrs. Bingham was certainly "possessed" of the Flagler trust property at the time of her death in the sense that she owned every beneficial interest therein, immediate and prospective, to the exclusion of everybody else on earth.

During the limited trust period, she was to receive an annuity of at least $100,000.00 from the trust property, and at the end of that period all of such property was to be turned over to her absolutely, including "all accumulations or enlargements of my estate and property as shall have arisen during the life and operation of said trust." No one else shares in the income therefrom; there is no gift over to anyone, and there was included in the trust decedent's summer home and residence in New York city, of which we apprehend Mrs. Bingham was not only "possessed" but "seized," since

doubtlessly she was intended to have and did have the actual possession thereof whenever she desired it.

The trustees were to administer the trust for a very limited time, "for the purpose of protecting, fostering, operating and developing" the various properties included in the trust until they no longer needed financial assistance, and in order "to relieve my beloved wife . . . from the immediate cares and responsibilities of so varied and such extensive interests." The trustees were therefore, we think, mere custodians for compensation, and not for exceeding ten years, to manage and develop the trust property for the sole benefit of Mrs. Bingham.

To understand how clearly this is made to appear, we copy the pertinent clauses of the will of Mr. Flagler creating the trust and declaring its purposes, which are as follows:

"Third. I have been for many years investing in railroads, hotel and land companies in the state of Florida, and it is my intention in the future to foster, protect and properly develop such properties, and to provide against my decease while such properties are in the processes of development and to relieve my beloved wife, hereinafter named, from the immediate cares and responsibilities of so varied and such extensive interests, I hereby declare a trust concerning all my property, both real and personal, and wheresoever situated, except what is covered by the 'fourth' item of this instrument, and may be necessary for the expense of administration by my executors, including court costs, to my trustees above named, which trusts shall be and continue for the length of time hereinafter by this instrument provided.

. . .

"Fifth. The balance of my estate I place, according to the purpose declared in the third item of this instrument, in the hands of my said trustees, to be used, managed and controlled by them and their successors for the purpose of protecting, fostering, operating and developing during the life of such trust, all my Florida properties, according to the purposes indicated by the charters of the several companies, and as nearly along the lines which I have adopted, or may hereafter adopt, as may be consistent with their judgment and discretion under the conditions which may hereafter exist. The said trust shall continue for five years from the time of my death, and if at the end of such five years the condi-

tion of the Florida East Coast Railway Company and the
Florida East Coast Hotel Company (they being my Flor-
ida railroad and hotel properties referred to) or either
of them, shall be such as to require financial aid from
sources outside of themselves or itself, then I direct that
such trust shall continue so long as either or both of such
last named companies shall require such assistance, but
not longer, however, than a period of five years from the
termination of the above mentioned or first period of five
years. It is, however, to be distinctly understood that
I do not authorize the railroad of said railroad company
extended south of Miami and no power to do so is given
hereby.

"Sixth. To my beloved wife, Mary Lily Flagler, the
annual sum of one hundred thousand dollars ($100,000.-
00) payable in quarterly installments from the date of
my decease; and I further direct that so much of the an-
nual net income from said trust property over and
above the said annuity and that hereinafter by subse-
quent clause of this item provided for, as shall not be
required during the extended or second period of said
trust, provided for in the fifth item of this instrument,
shall be paid to my said wife annually.

"Ninth. All the rest, residue and remainder of my
estate, whether real or personal and wheresoever situ-
ate, including of course all property covered by or in-
cluded in said trust and not payable out of the same or
at the end of said trust and all other property and estate
of any and every kind whatsoever, I give, devise and be-
queath to my beloved wife, Mary Lily Flagler (formerly
Mary Lilly Kenan, of Wilmington, North Carolina), for-
ever, and I hereby authorize and empower and direct my
said executors and trustees to pay over and transfer to
my said wife at the expiration of said trust all such es-
tate and property. And it is my intention to include in
this gift, bequest and devise all accumulations or en-
largements of my estate and property as shall have
arisen during the life and operation of said trust; and it
is also my intention to include in such devise my summer
home at Mamoroneck, in the county of Westchester,
state of New York, and my property number twenty-one
West Fifty-First street, in the city of New York, state
and county of New York.

"Tenth. It is my will and intention, insofar as I am
legally able to do so, to exempt my trustees in the matter
of investment and reinvestment of any portion of my es-

tate from the limitations as to the classes of securities that may be named in the provisions of the statutes of the state of Florida or of any other state or of the United States."

If Mrs. Bingham, who died during the trust period, was not "possessed" of this property as contemplated by the statute, then every person who dies the sole beneficial owner of property but which is temporarily held in trust by another for his exclusive use and benefit, may transmit that property to his heirs or devisees free of this "transfer tax," although the statute in the same section expressly provides that property passing by will, by intestate laws or by conveyance in contemplation of death to any person or persons, or to any body politic or corporate *in trust or otherwise,* shall be subject to the tax. In other words, if the contention of the defendant is sound, the legislature intended that the property the transferer owned subject to a trust for his exclusive use and benefit should not be liable to the inheritance tax in the hands of the transferee in any event, but the property that the transferer owned and had in actual possession should be liable to the same tax in the hands of the transferee, regardless of the trust with which it might be encumbered. Or stated in still another way, defendants' contention is that the legislature intended by this entire section that a transferee, who ultimately must pay the tax for the privilege of receiving the property, must pay it on property encumbered by any trust imposed by the transferer, but not upon property encumbered by like trust otherwise imposed.

We are utterly unable to believe the legislature so intended by this section considered as a whole or by the use of the word "possessed" in its ordinary and approved sense.

Summarizing his arguments in this behalf, counsel for the defendants says:

"Let me make a brief resume of what I have said on this subject and thus bring back to the court the main thought in connection with this point. We start upon the construction of this Kentucky inheritance tax statute, with the words in mind laid down by the court, as a guide for all of us, in the opinion of Judge Hobson in the Aetna Life Insurance Co. case in 115 Ky. 801, which I have heretofore quoted: 'That in the interpretation of all statutes levying taxes a cardinal rule is that their provisions are never extended by implication beyond the

fair meaning of the terms used.' Those are strong words: 'Never extended by implication beyond the fair meaning of the terms used;' 'and in every case of doubt they are construed most strongly against the government in favor of the taxpayer.' And then you take up the statute and you find that no property, and no transfer of property, is subject to the inheritance tax unless the devisor or the deceased at the time of death was seized or possessed of the property. You cannot extend those terms beyond their plain meaning. If the property involved be real property it must be property of which the person was 'seized,' property, therefore, of which he was in possession, or entitled to possession, at the time of death. If personal property, it must be property of which he was 'possessed;' and by our statute that word must be given its meaning 'according to the common and approved usage of language.' And the undisputed plain fact is Mrs. Bingham was not in possession at the time of her death of the property held by the trustees under Mr. Flagler's will. She did not have physical possession of it, and she had no control over it, but others, trustees under her first husband's will, had that property, and for ten years were to hold it for the benefit of certain Florida corporations. And she was to get simply what was left when the trust terminated. Now, if we just let the statute mean what the statute says—if we do not attempt to extend it 'by implication beyond the fair meaning of the terms used'—it seems to me there can not possibly be any doubt about its meaning.

"Before leaving this subject, I should probably briefly refer to a reference made by counsel for the state to the language of Mrs. Bingham's will in which she uses the phrase 'seized and possessed' in the fifth item of the will. They suggest that if she was not 'seized and possessed' of the property held by the Flagler trustees, then the interest in that property did not pass under will. And their argument seems to be that the court should construe the words 'seized or possessed' in the Kentucky statute according to what they say was the sense in which Mrs. Bingham used these words in her will. To begin with, it would be a remarkable thing for the court to construe a statute, which applies to all wills and to all inheritances, according to the language that may have been used, whether accurately or inaccurately, in the will of some particular testator."

It will be noticed that this argument is based largely upon the assumption that the trustees held the Flagler trust property for the benefit of those properties, and not for the present and future benefit of Mrs. Bingham, and in this counsel is plainly mistaken, as the provisions of the Flagler will indubitably prove. It was plainly Flagler's expectation that the need of financial assistance by these properties to render them extremely valuable for his sole beneficiary was but temporary; and obviously his object in providing for the trust was to relieve his beneficiary of the worry and trouble that might be required of her to carry these properties through the development stage. He was intensely interested in these properties, it is true, and spent money freely but wisely in developing them, and if he had been as much concerned about their continued operation, regardless of whether that could be done profitably, as counsel for defendants assume, he would have provided for their maintenance, not merely for the short time considered necessary for their proper development but for a very much longer period, if not for all time. He knew better than anybody else the ability of these properties ultimately to produce profits for the object of his concern, if they were but given proper financial support for a short time, and this he provided for, as he himself said, in order that his beneficiary might escape even the trouble and annoyance incident thereto.

To say that Mrs. Bingham was not "possessed" of this property requires extreme technicality, and disregards entirely the fair meaning of the term, "according to the common and approved usage" thereof.

Then again counsel is mistaken in assuming that we ought not to construe this use of "possessed" by the legislature in very much the same way that we would construe it when used in Mrs. Bingham's will, for by reason of the provisions of section 460 of the statute, *supra,* we are required to give it its common and approved meaning in order to ascertain the intention of the legislature, just as we are required to give the language of the will its meaning according to the common and approved usage in order to ascertain the intention of the testator. In the one case just as in the other, it is our duty to ascertain the intention of the maker from the ordinary language employed according to its common and approved usage, in the light of the attendant cir-

cumstances and under the assumption that no absurdly unfair or preposterous thing was intended.

We therefore conclude that Mrs. Bingham, at the time of her death, was "possessed of" the Flagler trust property, and that the beneficiaries under her will are liable to an inheritance tax upon the value of their respective interest therein, unless exempt under the law.

2. Mrs. Bingham's administrator has paid into the treasury of the United States the sum of $7,509,283.65, in accordance with the provisions of the Federal tax law enacted by Congress September 8, 1916, and the next question for decision is whether or not this amount should be deducted from the total value of her estate before computing the state inheritance tax.

According to the authorities cited, such deductions are permitted in Connecticut, Minnesota, Illinois, Pennsylvania, Colorado, Indiana, New Jersey, Oregon, California and Massachusetts, but denied in New York, Rhode Island, Wisconsin, Iowa and Louisiana. Corbin v. Townsend, 92 Conn. 501; State v. Hennepin County, 139 Minn. 210; People v. Passfield, 284 Ill. 450; In re Knight's Estate, 261 Pa. 537; People v. Bemis, 68 Col. 48; State v. First Calumet T. & S. Co. (Ind.), 125 N. E. 200; Bugby, Controller, v. Roebling (N. J.), 111 Atl. 29; Poulsen v. Hoff (Ore.), 199 Pac. 615; In re Miller's Estate, 184 Cal. 674; Old Colony Trust Co. v. Burrell (Mass.), 131 N. E. 321; In re Sherman's Estate, 166 N. Y. Supp. 19; Hazard v. Bliss (R. I.), 113 Atl. 469; In re Weeks' Estate (Wis.), 172 N. W. 732; In re Sanford's Estate (Ia.), 175 N. W. 506; In re Succession John R. Gheens, 148 La. 117.

It is therefore at once apparent that the decided weight of authority is with the defendants on this point, and sustains the judgment which allows the deduction; but counsel for plaintiff insist: (a) That the better reasoning supports the minority view, and (b) that this court in Hampton's Admr. v. Hampton, 188 Ky, 199, 221 S. W. 496, already in effect, has adopted that view. In our judgment neither of these contentions is sound.

(a) Examining the authorities cited above which support the minority view, we find that no two of them are based upon the same reasoning, and that they do not, therefore, sustain any particular reason for a denial of the deduction in which alone they agree.

The Rhode Island case has but little value as authority outside of that jurisdiction, since it was decided by a

divided court, three members thereof concurring in the opinion and the other two members of the court dissenting therefrom. In the Wisconsin case, the court—as a New Jersey court has aptly said—"took pains to question its own logic," and this fact is peculiarly pertinent here since the Wisconsin inheritance tax law, just as does our own, makes no provision for any deduction whatever from the value of the property which passes to the transferee; yet in that state, just as here, it is the established practice under judicial sanction, to deduct the ordinary costs of administration to ascertain the values upon which the tax is to be computed. As its reason for denying the deduction, the court says:

"There is no provision made in the statute for any deduction from the value of the estate as it may be determined as of the death of the deceased, and we see no warrant for reading into the statute provisions for the deduction of any amount which the legislature did not see fit to insert. The legislature, having the power to impose a tax upon the passing of property from the dead to the living, had the exclusive power to determine the method by which the amount of tax should be ascertained. It having done so in what we think to be unambiguous language, there is no room for construction."

Obviously, the acceptance of this reason for denying the deduction inevitably leads to a repudiation of the established practice in the state of allowing deductions for costs of administration, and this the court thoroughly recognized since it says:

"There may be some difficulty in reconciling these conclusions with the prevailing practice of deducting the expenses of administration. We realize that our logic would lead to a rejection of all such reductions."

As we have held in several cases that under our law the ordinary expenses of administration, though not mentioned, are deductible it is obvious we would find ourselves in the same illogical position as did the Wisconsin court if we accepted its reason and denied the deduction of Federal estate taxes paid, unless we overruled the cases allowing the deduction of administration costs, and this we are unwilling to do.

The Iowa case obviously can not be accepted as authoritative here, since the denial of the deduction under the inheritance tax law of that state is based upon the fact that that law states specifically and in detail just

what deductions were allowable, which our statute does not do.

The Louisiana case considers the Federal tax to be in fact a transfer tax, though nominally an estate tax, and upon the ground that Congress was without right or power to impose such, or any other kind of tax, "upon that portion of the estates of deceased persons exacted by the legislature for state needs," it was held that the Federal tax was not deductible in computing the state tax. That the state court was in error in assuming that Congress was without right to impose the so-called Federal estate tax, whatever its exact nature, without first deducting the state inheritance or transfer tax, we think is conclusively established by the case of New York Trust Co. v. Eisner, 256 U. S. 345, in which the Supreme Court of the United States expressly held that a state legacy or succession tax could not be deducted before computing the value of the estate upon which the Federal tax is levied.

This leaves the opinion of the New York Supreme Court in the case of In re Sherman's Estate, 166 N. Y. Supp. 19, which was affirmed by the Court of Appeals, but without opinion, in 222 N. Y. 540, and other like cases of the New York Supreme Court, as the only possible basis for our acceptance of the reasoning judicially advanced in support of the minority view upon the question being considered. This opinion, as are other like opinions from the same court, is based in part upon the conception—with which we cannot agree—that the Federal act of 1898, under which such deductions had been denied, was of substantially the same character as the present act of 1916; and also in part upon the fact that the New York inheritance statute, like the Wisconsin and Kentucky statutes, provides for no deductions whatever. The controlling reason, however—we take it, although this is not entirely clear—is based upon the same theory as is the Louisiana case already referred to, since the court says:

"If the Federal government may impose an inheritance tax which is entitled to be deducted from the estate prior to the assessment of the state transfer tax, it has interfered with such conditions and has diminished the amount which the state has appropriated as a condition of the transfer being had by the percentage upon the sum appropriated by the Federal government. The state transfer tax will thus have become not one upon

the whole estate transmitted, but one upon the whole estate less the amount of the Federal tax. This lessening of the transfer tax, while not large in the case at bar, would aggregate a very considerable sum when applied to all the estates subject to the tax within the state. The constitutionality of a Federal act entitled to such a construction and effect might well be doubted.''

We think it is clear, therefore, that the opinions of the courts accepting the minority view, and relied upon by the Commonwealth, are based upon reasons too diverse and, as will later appear, too variant from our conception of our own law's meaning to justify our acceptance of the minority view, even if, as counsel for the Commonwealth insists, there is very little agreement between the courts adopting the majority view as to the principles upon which their decisions are based.

In view of the length to which this opinion will be necessarily extended, we can not attempt to harmonize all the reasoning upon which the courts of last resort in ten states have reached the same conclusion, that the Federal tax is deductible before computing the state inheritance tax. We think it is sufficient to say that in all of them the deduction was allowed principally, if not solely, because of a conviction that the state law contemplated an assessment of the state tax upon the net beneficial interest that the recipient would actually receive, rather than upon the interest which theoretically and technically may have passed under the will or gift of the decedent, but which before it beneficially reached the transferee was lessened by the Federal tax on the transaction.

This construction of a state inheritance tax law is desirable, if permissible under the language in which it is expressed, since it makes it fair and just, and relieves the court of imputing to the legislature an intention to levy a tax upon the Federal tax which the recipient of the estate could never receive or enjoy for a minute, and which the state could not prevent, unless, perhaps, by doing the recipient the unthinkable wrong of escheating the whole estate.

We think it clear that our statute, although it makes no provision for any deductions, provides that the tax shall be estimated upon the fair market value of the beneficial interest of the transferee, and that the legislature by so providing intended that interest should be estimated at the time and in the condition that he would re-

ceive it, rather than at the time and in the condition that technically the title thereto vested in him.   This construction, besides being entirely consistent with the language employed, relieves the statute of the manifest injustice of requiring the transferee to pay an inheritance tax upon the amount of the Federal tax; leaves undisturbed our decisions that administration costs are deductible; avoids any possible conflict of authority between the state and Federal governments; is sustained by the overwhelming weight of authority; and in our judgment is supported by the better reasoning.   It is, therefore, adopted.

(b)   The case of Hampton's Admr. v. Hampton, *supra*, in which it is urged we took a position contrary to or inconsistent with this view, considers only the Federal estate tax law in connection with our laws of descent and distribution to ascertain whether or not the Federal tax is an obligation of the decedent under the former or an item of expense in the administration of his estate under the latter, and decides, correctly we feel sure, it is neither; that as a consequence it is not chargeable to the personal estate alone, as are obligations of the decedent and costs of administration under the state laws of descent and distribution, and that although made payable by the Federal act as a matter of convenience by the personal representative that act contemplates its payment upon final distribution out of the entire estate and by each distributee proportionately, unless otherwise provided by the decedent.

Neither the question now under consideration nor our inheritance tax law was involved or considered in that case, nor does the conclusion therein reached in any way militate against our conclusion here, based as it is upon a conviction that our inheritance tax law meant to tax only the beneficial interest each transferee actually receives rather than the technical legal interest passing to him out of which the Federal tax must first be taken before its fair market value can be ascertained, and upon which the act provides the tax shall be computed.

In this view, the primary and exclusive right of the state to prescribe the terms upon which property may pass from the dead to their heirs or devisees, which counsel for plaintiff assert upon abundant authority and upon which they lay much stress, is not involved and need not be discussed.

3.   That inheritance taxes imposed by the states in which the property is located should be deducted before our inheritance tax is imposed we have no doubt for the same reasons that the Federal tax should be deducted; and because, too, we can have no possible chance to permit the transmission of property unless and until the state that has possession and control of it consents thereto.  Necessarily, it seems to us, the price such state puts upon its consent to surrender possession of the property to our jurisdiction must precede the price we put upon the recipient's privilege of receiving it.

4.   We decided, October 29, 1922, in Sage's Exrs. v. Commonwealth, upon a consideration by the full court, that nonresident educational and religious institutions not operated for gain but as purely public charities, and confessedly of the same kind as are those claiming an exemption here, are exempted from payment of inheritance taxes by subsection 4 of the act imposing such taxes, and we need not, therefore, restate our reasons for holding that the court did not err in exempting such institutions here involved.

5.   Are large blocks of stocks and securities having a recognized market value to be appraised by the same rules as are small blocks thereof?

Mrs. Bingham owned very large blocks of stock in the Standard Oil group of corporations, as well as in many other corporations, which it is agreed had a recognized market value at the time of her death.  It is further agreed that the "ask" and "bid" prices of same, as ordinarily traded in on the New York market, are correctly quoted in the weekly issues of the NewYork Commercial and Financial Chronicle, and that all such stocks and securities in both the Bingham estate and the Flagler trust were appraised herein at the "bid" prices quoted in the Chronicle the next day after her death.

It is urged, however, by counsel for defendants, although conceding such an appraisement would have been fair for small blocks of such securities, that the same method cannot be justly or legally employed in appraising the large blocks owned by this estate, because it is shown without contradiction such quotations are based upon transactions involving only from 10 to 100 shares, whereas Mrs. Bingham owned thousands, which could not have been disposed of at the quoted prices within six months or any reasonable period after Mrs. Bingham's death.

The basis of this argument is the provision of the statute imposing the tax upon the fair cash value of "such legacy," and our definition of "fair cash value" in Eminence Distillery Co. v. Henry County Board of Supervisors, 178 Ky. 811, 200 S. W. 347. In that case we were construing "fair cash value, estimated at the price it would bring at a fair voluntary sale," as employed in section 172 of the Constitution and section 4020 of the statutes, with reference to assessing property for *ad valorem* taxes. But the meaning of "fair cash value" is so evidently the same in each instance, and as counsel upon each side of this case rely upon that case in support of their contrary conclusions upon the question under discussion, we shall look to that definition as our guide here, rather than to the inharmonious construction given the words "fair cash value" by other courts in reference to the assessment of property for taxation. So much of the opinion in the Eminence Distillery case as is pertinent here reads as follows:

"There are various definitions of the term 'fair cash value,' as used in section 172 of the Constitution and section 4020, Kentucky Statutes, growing out of the various adjudications of the courts in various states, as this term appears in the taxing laws of many states, or words having the same meaning and intendment. The Constitution and lawmakers, however, have defined its meaning as applied to assessment of property for taxation in this state by the further provisions of the sections, *supra*. They provide that in arriving at the 'fair cash value' of property for taxation purposes, that it shall 'be estimated at the price the property would bring at a fair voluntary sale.' *This excludes the idea of estimating the value of the property at such a price as it would bring at a forced or involuntary sale, but it makes necessary the contemplation for the sale provided for, the willingness of the owner to sell and the presence of one desiring to buy, and in estimating its value such conditions must be contemplated. Where articles of property are of common use, and where sales of such are being continuously made, it is easy to arrive at the fair cash value of articles of similar character by comparison with the values, which the article sold, brought at fair voluntary sale* (but it is apparent that in the case of a modern plant for the distillation of spirituous liquors it is difficult to determine the value, because of infrequency of sales of such species of property, the limited number

of persons who have the financial ability to become purchasers, and the small number of such plants in comparison with many other species of property, and the dissimilarity in the size and equipment of the various plants. Their values are not and can not be matters of knowledge within the grasp of many persons. In such cases the assessors, as well as all other persons having taxing authority, in arriving at the fair cash value of the property, must necessarily take into consideration the conditions and circumstances which surround each particular case, including the transportation facilities, cost of equipment and construction, if recent, its adaptability for its purpose, and every element which will have an influence in appreciating or depreciating its value, and thus with the best light attainable, determine its fair cash value as contemplated by the Constitution and statutes)."

The italicised portion of the above is relied upon by the plaintiff; while the defendants rely upon the latter part which we have enclosed in parentheses.

It is perfectly clear, we think, that stocks and securities so extensively traded in as that they have a recognized value which is quoted daily upon the stock exchanges of the country, are, in the language of that opinion, "articles of property of common use," and such as "it is easy to arrive at the fair cash value . . . by comparison with values, which the article sold, brought at a fair voluntary sale," and that such stocks and securities are not at all like "a modern plant for the distillation of spirituous liquors," the value of which is not and can not be "matter of knowledge within the grasp of many persons."

It is therefore clear, we think, that under our definition of "fair cash value" in the Eminence Distillery case, the value of these stocks and bonds must be appraised by comparison with the values which the same and other like securities brought when sold at a "fair voluntary sale."

The only expression found in that opinion which even apparently lends any support whatever to the defendants' contention is the reference to the limited number of persons who have the financial ability to become purchasers of a modern distillery plant, but even that support is not real, because a distillery plant, being a single unit of property, must of a necessity be sold or appraised as a whole and at one time, and its value can not,

of course, be ascertained by a comparison with the values which other distilleries brought when sold at fair voluntary sales, because presumably no two of such plants are of the same size and character, whereas every one of the shares of stock in a given corporation are exactly alike in every particular, and their fair cash value can be easily and certainly ascertained on a given date by comparison with the values which other like securities brought when sold on that date at a fair voluntary sale..

We said in that opinion that the fair cash value, estimated at the price the property would bring at a fair voluntary sale, contemplated the willingness of the owner to sell and the presence of one desiring to buy, and such a sale of course contemplates also that the one present and desiring to buy must be able to buy, else his presence would amount to nothing.

And this necessity of contemplating a sale at which both seller and buyer are present who are both willing and able to sell and buy, is a fundamental fact under that opinion involved in assessing "property for taxation in this state" according to its "fair cash value" as these terms are defined by our Constitution and lawmakers." This is not only clearly implied by what we said in the Eminence Distillery case, but it is further emphasized by the statutory requirement that all property be assessed at its "fair cash value" on a certain fixed date, without reference to whether that value be large or small, rather than on such date if its value be small but within "a reasonable time thereafter" if its value be large, as is the sum of defendants' whole contention.

The basic or fundamental error in that contention is the assumption that stocks and securities, or any other "articles of property," are to be appraised for taxation in blocks or in mass rather than as units. To adopt that view as defendants would have us do leads inevitably to the manifest injustice of appraising the same property for taxation at different values per unit on the same day against different owners, thus making the taxing value depend wholly upon the amount of such property different taxpayers may own on the taxing date in utter disregard of the constitutional guaranties that all men, in the eyes of the law at least, are "free and equal" and that taxes "shall be uniform upon all property of the same class." Such a manifestly unfair and unjust method of assessing property for taxation is not only not permissible under our Constitution, but it is not pro-

vided and was never contemplated by any statute. While it is of course necessary to assess an entire legacy under this statute at its fair cash value, just as it is necessary to assess the entire property of any owner for *ad valorem* or other taxes to ascertain what he owes the state, every such assessment contemplates an assessment by units as customarily traded in at the fair cash value of such units on a given day, and not as a mass or in blocks within such time as would be reasonably required to sell such blocks or the whole.

Even defendants do not insist upon carrying their theory to its logical end, and ask that "such legacy" of each devisee be assessed as a whole, and its value be ascertained by contemplating a sale of the whole thereof within six months, or any other period, after the taxing date.

For instance, they prove by experts, and it is of course true, that by placing large quantities of a given stock on the market within a period of six months the market value of such stocks would be depressed, and that to sell the 16,400 shares of Standard Oil of N. J., owned by Mrs. Bingham, upon the market would have reduced its value to 80% of its quoted value when she died, and from this they argue that because of its size this block of stock should be valued at only 80% of its quoted value.

Why, may we ask, if Mrs. Bingham's 16,400 shares of Standard Oil of N. J., quoted at 595 on the day after her death should be assessed at what it would bring upon a sale of the whole, or 80% of its quoted price, should not an entire legacy worth nearly twenty millions, or indeed the whole estate worth nearly eighty millions of dollars, be valued as a whole rather than by valuing separately each block of stock and then adding together these block values? There is as much reason for the one process as the other, and no law for either; and by assessing it all together the result doubtless would be much more acceptable to the taxpayer, because there certainly could be but very few persons, if any indeed, who desired and were able to buy it at any one time or within any reasonable time thereafter.

If defendants had elected to adopt this method of valuing this estate, they no doubt just as easily and in the same way could have proven that the units of property owned by Mrs. Bingham were worth for taxation purposes in her hands even less than 80% of the taxable

value they. had upon the same assessing date in the hands of persons who were so unfortunate as to own but ten or a hundred of such units.

This tax law, like all others in this state at least, contemplates, we are sure, the valuation of all property. for taxation in such units as it is ordinarily traded in, rather than in blocks as it happens to be owned on the taxing date, because only by so doing is it possible to ascertain the fair cash value on the given date of any kind of property, and because, too, under our form of government there can not possibly be one method applicable to the rich and another to the poor for valuing the same kind of property on the same day.

Being thoroughly so, minded, we do not deem it necessary to attempt to reconcile the cases from the New York courts, where it would seem the matter is controlled by statute, or do more than state that those relied upon by the Commonwealth (Gould's Estate, 46 N. Y. S. 560; Kennedy's Estate, 153 N. Y. S. 192; Chambers' Estate, 155 N. Y. S. 152) follow the statute and deny any discount for size; while the cases relied upon by defendants (Curtice's Estate, 97 N. Y. S. 444; Chappell's Estate, 136 N. Y. S. 271) ignore the statute for some reason not apparent to us, and for reasons we do not regard as sound allow a discount for size.

Nor do we think it necessary to comment upon the only other case cited upon this question (Walker v. People, 192 Ill. 106, 61 N. E. 489) further than to state that in it the court refused to allow a deduction from the established market price for the taxing date because of the depressing influence a sale of the large quantity of such securities involved would have had upon the market price if all had been offered at one time; and that in our opinion the only difference between what was there denied and what defendants are here contending for is one of degree and not of principle. Each, in addition to the vices already pointed out, would substitute for a certain known value established in an open market under ordinary conditions, an uncertain and unknown value to be determined by speculation among experts as to what it would have been on a given date if something which did not occur had happened then or within a reasonable time thereafter.

We do think, however, that before leaving this subject we should call attention to the fact that neither party is asking in this action for a valuation based upon

the average of the prices as actually established on the market through a reasonable period of time rather than on the taxing date merely, as is provided by the New York statute, and that we do not now mean to disapprove of such a method for valuing this kind of property in the hands of any owner regardless of its total value, if it should be shown that on the taxing date the price was extraordinarily high or low.

6. From what date does interest run on the amount of the tax found to be due?

Section 4281a-4, Kentucky Statutes, provides:

"All taxes imposed by this chapter, unless otherwise herein provided for, shall be due and payable at the death of the decedent, and if the same are paid within eighteen months, no interest shall be charged and collcted thereon, but if not so paid, interest at the rate of ten per centum (10%) per annum shall be charged and collected from the time said tax accrued."

And section 4281a-5 that:

"The penalty of ten per centum (10%) per annum imposed by section 4 (4281a-4) hereof, for the non-payment of said tax, shall not be charged in case where, by reason of claims made upon the estate, necessary litigation, or other unavoidable cause of delay, the estate of any decedent, or a part thereof, can not be settled at the end of eighteen months from the death of the decedent; and in such case only six per centum (6%) per annum shall be charged upon the said tax from the expiration of said eighteen months until the cause of such delay is removed."

Taken literally, and assuming the legislature meant what it said, this clearly provides for interest at 6% from January 27, 1919, since Mrs. Bingham died July 27, 1917, and this the Commonwealth insists is conclusive.

The circuit court upon authority of Commonwealth v. Southern Pacific Co., 169 Ky. 296, 183 S. W. 925, charged interest from July 16, 1920, the date upon which the county court rendered its judgment fixing the amount of the tax due.

Defendants insist that under the principles announced and applied in the Southern Pacific case, and later approved by this court in Commonwealth v. Bingham's Admr., 187 Ky. 749, 220 S. W. 727, interest should be charged only from the date of the judgment of the circuit court herein, December 31, 1921, where the case on

appeal from the county court was tried *de novo* as provided in section 726 of the Civil Code of Practice.

Being convinced that the principles announced in the Southern Pacific case have no application here, we think the plain letter of the statute must be followed, and that therefore interest runs from January 27, 1919, as contended for the Commonwealth.

The tax due in that case, a franchise tax, before it became due by or collectible from the owner, had to be assessed against it in some one of the several ways in which property is assessed for taxation, and the owner was not delinquent in any duty imposed upon him by law until such assessment was ascertained according to law. The property of the owner having been assessed against it by the board of equalization at an exorbitant figure, the owner, as the law gave it the right to do before the assessment became final, appealed to the quarterly court for review of the board's assessment. The quarterly court materially reduced the assessment and the owner promptly paid the taxes thus found to be due.

We held that the owner should not be required to pay penalties when it was not delinquent in its duty to pay the taxes it owed; that it was not delinquent during the pendency of the appeal to the quarterly court as the law gave it that right; and, that to charge it interest and other penalties the law imposed for delinquency would be unfair and was not intended, although another and general law provided that all taxes, unless otherwise specially provided, should be due on the first day of March after assessment and become delinquent if not paid on the first day of December thereafter.

But in that case, as in all others adopting the principles therein applied, both in and out of this state, upon which counsel for defendants rely, it was the duty of some assessing authority to assess the property before it became the owner's duty to pay taxes thereon, whereas under our inheritance tax law it is made the absolute duty of the personal representative to pay, within eighteen months after the death of the decedent, all inheritance taxes due, from any heir or devisee, without an assessment by any assessing authority; and that law provides expressly, as we have seen, that after eighteen months, regardless of any litigation that may be necessary to ascertain the amount due, the tax must bear interest at 6% per annum.

In saying that no assessment is required, we have not overlooked provisions of subsection 11 of the act, being section 4281a-11 in the 1922 edition of Kentucky Statutes, for the appointment of an appraiser by the county court "on application of any interested party" or upon the court's own motion when the value of any inheritance is uncertain, as is the case here. That section under which this litigation started very clearly does not impose a primary duty of assessment upon the state, which the taxpayer may await before he becomes delinquent to the extent of a liability for taxes and interest, as was the case in the Southern Pacific case and others like it; and that it was not so intended by the legislature is too plain for differences of opinion, because in the same act, as we have already seen, it is provided with like clearness that despite any delay caused by litigation or "other unavoidable cause" the tax ultimately found to be due shall bear six per cent interest "from the expiration of said eighteen months until the cause of such delay is removed."

This is certainly express statutory authority for collection of interest after eighteen months and until the cause of the delay, whatever the cause, is removed; and it is so clearly stated as to admit of no doubt whatever of the legislature's intention with reference to the precise facts we have here.

We are therefore in no position to say here as we said in the Southern Pacific case in denying liability for interest: "Clearly it could not have been the legislative purpose to exact from a taxpayer a penalty for failure to pay his taxes when the agency selected by the state for that purpose has not assessed his property in time for him to have voluntarily paid the tax in time to escape the penalty."

The legislature having thus plainly stated its intention with reference to the facts here, we can not, of course, infer a contrary one, even if our sense of justice inclined us to do so.

7. The questions of fact raised by the parties upon these appeals involve the values fixed by the circuit court upon stocks and securities of corporations included in the Flagler trust, the entire issues of which were owned by Mrs. Bingham. These properties had no established market value because they were not sold or offered for sale or quoted anywhere, and they could not therefore be valued as were the Standard Oil stocks and

other securities having an established and regularly quoted value.

The evidence as to the value of these properties assuredly is, as the trial judge says in his opinion, "indefinite and uncertain;" and both that opinion and the judgment herein are such conclusive proof of the great care and ability he gave to the consideration of this case with its many difficult questions of law and fact, that upon the questions of fact, after a careful consideration of the evidence and argument of counsel upon every contested point, we do not feel warranted in disturbing his findings in a single instance, or in discussing the evidence other than to refer briefly to that with reference to one item of such property to illustrate the wide divergence in its value as indicated by the different methods by which the parties sought to have it valued; and the inconclusiveness of the result obtained by using any one rather than another of such methods, which necessarily forced the court, giving due consideration to all the data furnished, to reject the extremes advocated by the parties and fix the value somewhere between those extremes. To attempt to do otherwise would greatly extend the opinion, already too long, without serving any useful purpose.

The item selected for this purpose is the common stock of the Florida East Coast Railroad Company, all of which was owned by Mrs. Bingham. There were 125,000 shares of this stock, of the par value of $12,500,000, which the court valued at twenty-five cents on the dollar, or $3,125,000.00. The defendants claim that it should have been valued, upon the evidence, at not to exceed seventeen cents on the dollar, or $2,125,000.00; while the Commonwealth claims that it should have been valued at eighty-four cents on the dollar, or $10,500,000.-00.

In support of their contention the defendants rely upon the fact that never in its history has this stock paid a dividend or earned enough to have paid one until 1915; that two competent experts testify, and no one has testified otherwise, that it is practically worthless except for purposes of control, that, in their judgment, if offered for sale it would not bring more than seventeen cents on the dollar; that the company never earned enough to pay operating expenses and interest on its $37,000,000.00 of bonds except in 1915, 1916 and 1917; that these earnings were abnormal and due to war conditions; that it would be improvident to use any of such

earnings for dividends; that stock of other like companies, earning much more above fixed charges and on which dividends were not being paid, were selling at about the values fixed by these experts for this stock.

This evidence, if there were no more, would of course demand the acceptance of defendant's contention, but while no witness contradicts these facts, other facts are proven by the Commonwealth that, considered alone, indicate a higher value, although not nearly as high as is contended for thereon.

These facts are: Flagler carried such of this stock as was issued in his lifetime on his books at 80, and his trustees have carried such as has been issued to them since his death, for advancements under Flagler's will, at par. This stock was appraised by the appraisers, appointed in 1913 at Flagler's death to appraise his estate, at 80. Book value of the company shows par or better. Net earnings for 1917 capitalized at 6% make it worth about two for one; while capitalizing at 6% average net earnings for the three years, 1915-1917, makes it worth about 75.

The price at which Flagler carried this stock on his books or at which it was appraised in making an inventory of his estate when there was no contest or reason to contest its value, as well as present book value as explained, while evidential is not of much weight. The one item of evidence giving much support to the Commonwealth's view, or rather against defendants' contention, is the accumulated earnings of the company amounting to nearly $3,000,000.00. But much of its force is destroyed by the fact, not denied, that the three years in which it was earned were abnormal. There was a deficit every year until 1909, and we are sure no one would think of paying anything like 84 for such stock.

The court valued the stock at 25 cents on the dollar, and if we do not accept that, we do not know what to do. The only evidence supporting that particular figure is the first report filed by the administrator so stating, which it later amended to conform to its proof of 17 cents, and the fact that $3,000,000.00 of surplus on hand in cash is so nearly 25% of the $12,500,000.00 of stock outstanding. We think this is as near justice to all parties as can be done on the whole evidence. No one ever sold or bought, or offered to sell or buy the stock, so its value is necessarily speculative and incapable of exact proof. The parties doubtless did the best they

could in producing evidence of value, and the trial court evidently has done likewise in fixing the value on the evidence produced, and certainly the best we can do is to affirm its finding, since the contention of neither party can be sustained without ignoring the evidence of the other party, and this we are sure should not be done.

Our conclusions of law and fact affirm the judgment in every respect upon both appeals except as to the date from which interest runs, and it is reversed in that respect upon the appeal by the Commonwealth, with directions to make this correction.

Whole court sitting. ·